UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BARBARA M., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:22 CV 141 JMB |
| | ) | |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This action is before the Court pursuant to the Social Security Act, 42 U.S.C. §§ 401, et seq. ("the Act").  The Act authorizes judicial review of the final decision of the Social Security Administration denying Plaintiff Barbara M's application for disability benefits under Title II of the Social Security Act.  See 42 U.S.C. §§ 401, et seq.  All matters are pending before the undersigned United States Magistrate Judge with the consent of the parties, pursuant to 28 U.S.C. § 636(c).  For the reasons stated below, the Commissioner's decision is reversed.

I.    **Procedural History**

Plaintiff filed an application for disability benefits, beginning on May 4, 2018, as a result of the effects of anal cancer, stomach issues, gastrointestinal issues, diarrhea, and fogginess.[1]  (Tr.

---

[1] Plaintiff did not list fatigue as a basis for disability in her applications or in her request for reconsideration.  Failure to allege a disabling impairment in an application for disability benefits is a significant factor in determining the severity of an alleged impairment.  See, e.g., Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  Plaintiff offered fatigue as a basis for disability at her administrative hearing.

154, 305-20)  Plaintiff's claims were denied upon initial consideration.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  At a hearing on January 8, 2020, Plaintiff testified concerning the nature of her disability, her functional limitations, and her past work.  (Tr. 35-66)  The ALJ also received testimony from a vocational expert ("VE").  (Tr. 61-65)  The VE opined as to Plaintiff's ability to perform her past relevant work and to secure other work, based upon Plaintiff's functional limitations, age, and education.  (Id.)  In a decision dated May 29, 2020, the ALJ found that Plaintiff was not disabled and denied benefits.  (Tr. 127-42)

On June 9, 2020, Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social Security Administration.  The Appeals Council granted her request, vacated the May 29, 2020, decision, and remanded the case with directions for the ALJ to consider Plaintiff's maximum residual functional capacity and to provide appropriate reasons with specific references to evidence of record in support of the assessed limitations.  (Tr. 148-52)

After remand, Plaintiff requested another hearing before an ALJ.  Plaintiff and counsel appeared for a hearing on March 11, 2021.  She testified concerning the nature of her disability, her functional limitations, and her past work.  (Tr. 67-98)  The ALJ also received testimony from VE Brenda Young.  (Tr. 91-99, 479-80)  The VE opined as to Plaintiff's ability to perform her past relevant work and to secure other work in the national economy, based upon Plaintiff's functional limitations, age, and education.  (Id.)  After considering the hearing testimony and the other relevant evidence of record, the ALJ issued a decision dated April 23, 2021, finding Plaintiff not disabled and denying benefits.  (Tr. 7-27)

Plaintiff again sought review of the ALJ's decision before the Appeals Council.  (Tr. 1-4)  On May 27, 2021, the Appeals Council denied review of Plaintiff's claims, making the April 23,

2021, decision of the ALJ the final decision of the Commissioner.  Plaintiff has therefore exhausted her administrative remedies, and her appeal is properly before this Court.  See 42 U.S.C. § 405(g).

As explained below, the Court has considered the entire record in this matter.  Because the decision of the Commissioner is not supported by substantial evidence, it will be reversed.

## II.   Medical Records

The administrative record before this Court includes medical records concerning Plaintiff's health treatment from May 4, 2018, through November 27, 2020.  The following is a summary of pertinent portions of the medical records relevant to the matters at issue in this case.

### A.   Estes Park Medical Center and UCHealth (Tr. 484-502, 503-42, 570-610, 768-733, 851-88)

Between early May 2018, and continuing until August 2018, Plaintiff was diagnosed with, and treated for, anal cancer.  The diagnosis and treatment included a variety of procedures, including chemotherapy and radiation.  The records indicate that Plaintiff tolerated radiation treatment well.  In follow-up treatment, however, she reported diarrhea and rectal pain.  Plaintiff moved in with family in Missouri.

### B.   Missouri Baptist Medical Center - Drs. Belai Firwana and Alyssa Wait (Tr. 556-65, 612-41, 670-76, 766-833, 1159-84)

Between November 13, 2018, and January 16, 2020, Drs. Belai Firwana and Alyssa Wait treated and evaluated Plaintiff's anal nodule and diarrhea.

On November 13, 2018, Plaintiff established care with Dr. Firwana at Missouri Baptist Medical Center for follow-up treatment of anal cancer and concurrent chemoradiation.  A CT scan showed no signs of lymphadenopathy or recurrence, and an endoscopy showed no actual lesions, with a biopsy negative for carcinoma.  An endoscopy showed friable tissue but no actual lesions.  Plaintiff reported living with her family because she could not keep up with her job after starting

3

cancer treatment.  Dr. Firwana's review of Plaintiff's symptoms included diarrhea.  Dr. Firwana found that Plaintiff's colonoscopy consistent with a malignant tumor and the biopsy of the tumor was consistent with anal squamous cell cancer.

On December 13, 2018, Dr. Wait performed an endoscopy and noted her findings included a small, firm nodule and that Plaintiff's colon appeared to be normal.  Dr. Wait recommended that Plaintiff resume her diet and continue her medications.

On January 14, 2019, Plaintiff presented for evaluation of a perianal lesion and reported fecal incontinence and soiling following radiation treatment.  On January 16, 2019, Dr. Wait operatively examined and biopsied Plaintiff's perianal lesions and found anal canal scarring.  In a surgical pathological report, the examining pathologist could not rule out a squamous neoplasm.  Plaintiff reported doing better from a fecal urgence incontinence standpoint.

During treatment on February 12, 2019, Dr. Firwana noted that Plaintiff's recent endoscopy showed friable tissue but no actual lesions and her biopsy was negative for carcinoma.  Dr. Firwana opined that Plaintiff's bowel incontinence was likely caused by her cancer treatment.  Plaintiff also reported wearing incontinence briefs, and Dr. Firwana recommended that Plaintiff use the briefs daily and anticipated that she would need to wear the incontinence briefs for at least one year.  Dr. Firwana prescribed Lomotil to supplement Imodium for diarrhea.  Plaintiff reported an average of daily incontinence despite taking Imodium.

On April 15, 2019, Plaintiff reported bouts of diarrhea and continued fatigue. She reported wearing incontinence briefs and using Imodium, but still experienced an average of daily incontinence.  Dr. Firwana recommended that Plaintiff use the briefs daily.

During a colorectal surgery consultation on July 15, 2019, Plaintiff complained of an anal

nodule and erratic bowel movements.  An anoscopy performed that day failed to reveal any concerning lesions.  She was found to be doing well since she was last treated, but that she experienced erratic bowel movements.  Examination showed a normal anus and no perianal lesions, and a digital examination revealed no masses, normal tone, and good squeeze.  Dr. Wait recommended that Plaintiff take fiber.

During treatment with Dr. Firwana on October 17, 2019, Plaintiff reported continued fatigue, occasional bouts of diarrhea, and some accidents.  Plaintiff presented to Dr. Wait for cancer surveillance.  She reported fecal urgency, but she had experienced fewer accidents.  Overall, Plaintiff reported feeling better since her last treatment although she was not not taking fiber as recommended.  Dr. Wait again recommended that Plaintiff take fiber to help with her fecal urgency and occasional urge incontinence.

On January 16, 2020, Plaintiff was seen for cancer surveillance.  Plaintiff reported doing better with fecal urgence incontinence, but that she sometimes experienced difficulty with initiation of a bowel movement.  Dr. Wait noted that the anoscopy did not demonstrate any concerning lesions.

### C.   **BJC Medical Group – Dr. Reshma Eugene** (Tr. 643-63, 735-64, 1220-74)

On February 15, 2019, Plaintiff established care with Dr. Reshma Eugene, and she continued in Dr. Eugene's care through November 27, 2020 (the last medical treatment entry in the administrative record).  Plaintiff reported issues with diarrhea throughout this entire time, although there were periods in which her complaints did not involve diarrhea and the review of symptoms, exam notes, and treatment plan did not address diarrhea or fecal incontinence.

At her initial visit with Dr. Eugene, in February 2019, Plaintiff  complained of chronic diarrhea for the prior few months caused by radiation treatment.  Plaintiff explained that she had

diarrhea after eating, and fecal incontinence had increased over the past two to three weeks. Plaintiff explained that her diarrhea episodes fill her incontinence briefs and sometimes soil her clothing.  She further reported that her diet had not changed; she drank one to two cups of coffee daily and used Imodium prior to meals.  Plaintiff indicated that her chronic rectal pain was well controlled with Tylenol and Motrin.  Dr. Eugene's note indicated that Plaintiff used Imodium prior to meals, and Lomotil, as needed.  Dr. Eugene also provided Metamucil to take before meals to help bulk stools.

On March 15, 2019, Plaintiff reported "having a lot of high output diarrhea after meals, which she [indicated was] her new baseline after radiation." (Tr. 1262)  She also continued to experience fecal incontinence.  She reported using Imodium before eating.  Plaintiff explained that she had removed chocolate, eggs, and dairy products from her diet, but her symptoms still persisted and using Metamucil resulted in constipation.  Dr Eugene advised Plaintiff to continue taking Imodium prior to meals, and as needed during the day, for diarrhea control.  Dr. Eugene offered pelvic floor rehabilitation to help her incontinence, but Plaintiff declined the rehabilitation due to ongoing radiation dermatitis.  Plaintiff also reported that she had applied for disability.

During follow-up treatment on April 16, 2019, Plaintiff again reported ongoing chronic diarrhea "about the same as last time," (Tr. 1260) and she had continued fatigue.  Plaintiff reported doing well with erratic bowel function and but still having bouts of diarrhea.  Plaintiff also reported being active and helping her parents on the family farm and at a flea market.  Although Plaintiff reported wearing incontinence briefs and using Imodium, she still experienced daily incontinence. Dr. Eugene found Plaintiff's chronic diarrhea to be currently stable and recommended that she maintain a food diary so she could determine if any foods exacerbated her symptoms.  Dr. Eugene found Plaintiff's fecal incontinence to be stable, noting that Plaintiff wore incontinence briefs daily

6

and that "[s]he continues to have incontinence about 1-2 times per day."  (Tr. 1260)  An April 23, 2019, MRI of Plaintiff's pelvis showed no anal mass identified and previously identified marked rectal thickening had virtually resolved.

On June 6, 2019, Plaintiff's chief complaints to Dr. Eugene were left side pain and chronic fatigue.  Plaintiff explained that she would like to return to her activity level prior to her cancer, but she spent a lot of time sleeping.  Dr. Eugene ordered blood work to determine the cause of her fatigue.  Dr. Eugene's review of symptoms state that Plaintiff was negative for diarrhea, but the notes describing Plaintiff's pain reflect that she reported continued "chronic intermittent diarrhea, and … that everything has been stable."  (Tr. 1256)

During treatment on June 17, 2019, Dr. Eugene explained that Plaintiff's blood work showed normal labs and opined that her chronic fatigue was most likely secondary to her chemotherapy and radiation treatments.  There is no discussion of diarrhea or incontinence.

On August 19, 2019, Plaintiff reported a severe episode of diarrhea in the prior week, causing her to be tired for two days.  Plaintiff noted that her symptoms had improved so long as she used Imodium daily, and that the failure to use Imodium resulted in fecal urgency**.**  Dr. Eugene advised Plaintiff to continue to take Imodium as needed to help her symptoms.  Dr. Eugene again recommended that Plaintiff maintain a food diary so she could determine if any foods exacerbate her symptoms.

During treatment on September 26, 2019, Plaintiff reported issues due to having a grandchild at home.  The review of symptoms indicated that Plaintiff was negative for diarrhea.  Plaintiff was seen again on October 21, 2019, for a sore throat, and there is no reported issue regarding diarrhea or incontinence.

During follow-up treatment on November 26, 2019, Plaintiff reported continued fatigue, and that "she [was] very hindered by chronic diarrhea." (Tr. 1241)  Despite Plaintiff's report of diarrhea, Dr. Eugene's review of symptoms reported that she was negative for diarrhea.

The notes for Plaintiff's follow-up treatment on February 26, 2020, and for treatment of a rash on May 6, 2020, do not reference any complaints of diarrhea or incontinence.  Plaintiff returned on May 26, 2020, with complaints were anxiety and depression.  Dr. Eugene reported Plaintiff to be negative for diarrhea.

Plaintiff was seen again on June 16, 2020 for a COVID-19 evaluation and follow-up after she had been admitted to a hospital earlier in June 2020 for gangrenous cholecystitis.  Plaintiff reported that her abdominal pain was gradually improving, and she had not been taking Imodium for a few days and that her bowel movements had been regular.[2]  Despite reporting ongoing, albeit improving, abdominal pain, the review of symptoms indicated that Plaintiff was negative for abdominal pain as well as diarrhea.  Dr. Eugene encouraged Plaintiff to increase her activities as tolerated.

On August 5, 2020, Dr. Dugarte Figueroa performed a sigmoidoscopy and a digital rectal examination and found Plaintiff to be in remission.  In a follow-up visit with Dr. Eugene on August 27, 2020, Plaintiff reported having three days of diarrhea after her sigmoidoscopy procedure.  Dr. Eugene found Plaintiff negative for diarrhea in the review of symptoms but directed Plaintiff to use Imodium four times per day for diarrhea.

During follow-up treatment on November 27, 2020, Plaintiff reported being fatigued.  The notes from the visit reflect that Plaintiff reported that her diarrhea was "stable" but also "a little bit

---

[2] The treatment notes indicate that, in connection with her cholecystitis, Plaintiff had experienced an inability to pass gas or have a bowel movement.

worse since she has been feeling unwell." (Tr. 1220)  Dr. Eugene's review of symptoms reported Plaintiff to be positive for diarrhea and the assessment/plan reflected that Plaintiff continued to have "[c]hronic diarrhea due to radiation from squamous cell carcinoma." (Tr. 1221) Dr. Eugene advised Plaintiff to continue to stay hydrated and avoid any caffeinated products.

        **D.**    **Parkland Health Center** (Tr. 891-1156, 1186-1218)

From June 8 through 10, 2020, Plaintiff presented for evaluation of abdominal pain and was diagnosed with acute gangrenous cholecystitis.

**III.**    **Opinion Evidence – Drs. Reshma Eugene and Steven Adams, and Dennis McGraw** (Tr. 99-111, 835-40, 843-46)

        **A.**    **Dr. Reshma Eugene** (Tr. 835-40)

On August 29, 2019, Dr. Eugene, Plaintiff's treating physician, completed a Medical Source Statement – Physical.  Dr. Eugene reported that Plaintiff's diagnoses include a history of anal squamous cell carcinoma and chronic diarrhea.  Dr. Eugene noted that Plaintiff complained of chronic fatigue and multiple episodes of sudden diarrhea, sometimes causing fecal incontinence. Dr. Eugene found that Plaintiff could lift/carry frequently ten to twenty pounds; could sit for thirty minutes and for two hours total during a workday; and could stand or walk for thirty minutes and for less than two hours total during the workday. Dr. Eugene indicated that Plaintiff would need to take unscheduled breaks three to five times lasting fifteen to thirty minutes during an eight hour workday; would be off task twenty percent during the workday; and would miss work more than four days each month.

Dr. Eugene also completed a Medical Source Statement – Mental.  Dr. Eugene opined that Plaintiff would be off task twenty percent during the workday.  Dr. Eugene found Plaintiff to be moderately limited in her ability to remember work-like procedures and understand and remember

detailed instructions; and markedly limited in her ability to maintain regular attendance and to complete a normal workday and workweek.

**B.**   **Dr. Steven Adams** (Tr. 843-46)

On December 18, 2019, Psychologist Steven Adams completed a psychological evaluation. The evaluation was prepared "to make diagnostic and treatment recommendations," and indicates Plaintiff was being "considered for Medicaid benefits." (Tr. at 843)  Dr. Adams determined that Plaintiff could understand and remember simple instructions and sustain concentration and persistence on simple tasks, but she could not interact in moderately demanding social situations or adapt to a typical work environment.  Plaintiff reported binge eating a couple of times a week and experiencing bowel incontinence since undergoing cancer treatment, with anxiety causing increased incontinence.  Plaintiff indicated that her incontinence wakes her up at night.  Plaintiff reported having a boyfriend of one year, and they see each other a couple times a month.

**C.**   **Dr. Dennis McGraw** (Tr. 99-111)

State agency medical consultant Dr. Dennis McGraw issued an opinion on December 3, 2018.  Based on his review of relevant medical records, Dr. McGraw assigned Plaintiff a full range of the medium exertional level.  Dr. McGraw's opinion indicates that normal physical findings and the termination of radiation therapy support his conclusions.

**IV.**   **The Hearings Before the ALJ** (Tr. 35-97)

An ALJ conducted the initial hearing on January 8, 2020.  A second hearing was held on March 11, 2021, following remand from the Appeals Council.

A.      **The January 8, 2020, Hearing**  (Tr. 35-66)

1.   **Plaintiff's Testimony** (Tr. 43-61)

As of the hearing, Plaintiff lived with her parents.  Plaintiff represented that she cannot travel because she has to use the bathroom five to six times after eating.  Plaintiff indicated that she did not know what food causes these episodes.  Plaintiff explained that there are times her fecal episodes are so severe that they result in her being exhausted and fatigued for a couple of days.

Plaintiff acknowledged that she failed to keep a food diary as instructed.  Plaintiff testified that she consumes dairy products without having diarrhea.  Plaintiff explained that she stopped taking fiber because it made her constipated.  Plaintiff testified that she could eat fried chicken and mashed potatoes and gravy.

Plaintiff testified that Drs. Wait and Firwana were her treating doctors.  Plaintiff explained that Dr. Wait performed surgery to remove a nodule.  Plaintiff testified that she wears protective briefs on a regular basis.  Plaintiff indicated that, in February 2019, Dr. Firwana opined that Plaintiff would have to wear incontinence briefs for a year and then he would reassess whether she would continue wearing incontinence briefs.  Plaintiff reported to Dr. Firwana having daily incontinence.  The ALJ noted that a doctor offered Plaintiff pelvic floor rehabilitation to help with her incontinence, but Plaintiff declined the rehabilitation.  Plaintiff testified that she experienced her first panic attack during her first treatment with Dr. Eugene.

Plaintiff testified that she helps take care of the dogs and helps her parents with their flea market.  Plaintiff cleans her own room, and she assists her mother when asked.  Plaintiff recounted a particularly bad incontinence episode at a restaurant when she spent thirty minutes in the bathroom.

### 2. **The VE's Testimony** (Tr. 40-42, 61-64)

The VE identified Plaintiff's past relevant work as a housekeeper, a laundry worker, a machine packager, and a school bus driver.  Inasmuch as the Appeals Council found "the hypothetical presented to [the VE] at the hearing does not match the residual functional capacity assessment assigned to [Plaintiff] by the [ALJ] in the hearing decision" as a basis for remand, the undersigned will rely on  the VE evidence from the March 11, 2021, hearing to assist in evaluating whether Plaintiff can perform her past relevant work.

### B      **The March 11, 2021, Hearing** (Tr. 67-97)

### 1. **Plaintiff's Testimony** (Tr. 81-91)

Plaintiff testified that she experiences complications from cancer treatment, including chronic diarrhea.  Plaintiff testified that her condition has not changed, and she experienced a bout of diarrhea the night prior, causing her to use the bathroom a couple of times.  Plaintiff explained that, despite wearing protective undergarments to prevent diarrhea accidents, she sometimes cannot timely reach the restroom.  Plaintiff's diarrhea complications include both frequency and urgency.  Plaintiff explained that, almost immediately after she eats, she has diarrhea lasting for hours.  When experiencing chronic diarrhea, Plaintiff needs to use the restroom every fifteen to thirty minutes.

Plaintiff testified that she experiences fatigue bouts, resulting in lack of energy and drowsiness.  Plaintiff explained that she needs lie down for an hour during the day.  Plaintiff testified that she has been diagnosed with depression and anxiety, and she takes medication as treatment.  Plaintiff testified that she cannot carry more than ten pounds; she can stand or sit no more than fifteen minutes; and she can walk thirty feet.

## 2.  **The VE's Testimony** (Tr.77-79, 91-96)

The VE identified Plaintiff's past work as a housekeeper, a laundry worker, a machine packager, and a school bus driver.  The ALJ asked the VE a series of hypothetical questions to determine whether someone of Plaintiff's age, education, work experience, and specified functional limitations would be able to find representative work in the local or national economy. The ALJ first asked the VE to assume a hypothetical individual working at the medium exertional level who also:  would never use ladders, ropes, or scaffolds; could frequently use stairs; would not work at unprotected heights or around mechanical parts or other such hazards; could perform simple, routine tasks; could remember work procedures and make simple, work-related decisions; could not work in a fast-paced setting such as an assembly line; had the ability to stay on task and meet reasonable production requirements in an environment that allows the individual to maintain a flexible and goal oriented pace; had occasional interaction with coworkers but no interaction with the public.  The VE opined that such a hypothetical person would be able to perform Plaintiff's past work as a housekeeper or a laundry worker, but the other jobs would be eliminated.

Next, the ALJ asked the VE to assume a hypothetical individual working at the light exertional level with the same limitations as set forth in the first hypothetical.  The VE testified that the individual could work as a housekeeper and a laundry worker.  When asked if the individual could have no interaction with coworkers and the public, the VE responded such limitations would eliminate all jobs.  When asked if the individual had to alternate between sitting with standing and walking every fifteen minutes during the workday, the VE indicated such limitations would eliminate all jobs.  The VE indicated that if the individual would be off task twenty percent of the workday, all jobs would be eliminated.

13

Counsel asked the VE to consider the individual from the first two hypotheticals who would also need up to three to five times additional breaks of fifteen or thirty minutes or would miss four days of work each month.  The VE opined those limitations would preclude competitive employment.

## V.    The ALJ's Decision

In a decision dated April 23, 2021, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  (Tr. 11-27)  The ALJ determined that Plaintiff had severe impairments of status post chemotherapy/radiation therapy for anal cancer, anxiety, and depression.  (Tr. 14-15)

The ALJ determined that Plaintiff had a residual functional capacity ("RFC") to perform medium work with the following modifications:  (1) she cannot climb ladders, ropes, or scaffolds and can frequently climb stairs; (2) she cannot work at unprotected heights, around moving mechanical parts or other such hazards; (3) she can maintain concentration required to perform simple routine tasks, remember work procedure, and make simple work-related decisions; (4) she cannot work at a fast pace such as on an assembly line, but can stay on task and meet reasonable production requirements in an environment that allows her to maintain a flexible and goal-oriented pace; and (5) she can have occasional interaction with co-workers, but no interactions with the public  (Tr. 17-24)

The ALJ addressed the medical opinion evidence, including state agency consultant Dr. McGraw and Plaintiff's treating physician, Dr. Eugene.  The ALJ found Dr. McGraw's opinion that Plaintiff was capable of a full range of medium exertion level work to be only partially persuasive.  The ALJ noted that Dr. McGraw's assessment was broadly consistent with Plaintiff's history of conservative medical treatment after August 2018, as well as Plaintiff's non-compliance, her improvement over time, and findings of normal gait and demeanor.  The ALJ explained that

14

she accommodated Plaintiff's fatigue and dizziness "to the greatest extent possible," by including additional limitations related to particularly strenuous postural work and restricting exposure to hazards.  (Tr. 20)

The ALJ found the opinions of Dr. Eugene, Plaintiff's treating physician, to be unpersuasive.  Dr. Eugene indicated that Plaintiff would require three to five unscheduled fifteen to thirty minute breaks in an eight-hour workday due to chronic diarrhea, that she would be off task twenty percent of an eight hour workday, and that she would be absent more than four days per month.  The ALJ found that the medical record reflects occasional references to fatigue during chemotherapy and radiation therapy, but that Plaintiff frequently reported stability or improvement of her symptoms.  Regarding the need for unscheduled breaks, the ALJ found that the medical record showed approximately one year of reports of frequent diarrhea, which had intermittently improved during that time period, and which had largely resolved near the end of the relevant time period.  The ALJ also opined that the record as a whole, and Dr. Eugene's own treatment notes, do not support her recommended manipulative limitations.

The ALJ found that Plaintiff's statements concerning "the intensity, persistence and limiting effects [Plaintiff's] symptoms are not entirely consistent with medical evidence in the record," and "the record … does not support [Plaintiff's] extreme account of limitations, including her alleged ongoing frequent restroom use and inability to carry more than five or ten pounds.  The totality of the evidence, including a period of frequent diarrhea and accompanying fatigue following several months of concurrent chemoradiation, exacerbated by [Plaintiff's] treatment non-compliance, in the context of essentially benign physical examinations throughout the period at issue, [and] the eventual essential resolution of the same, … supports limiting [Plaintiff] only as" set forth in her decision.  (Tr. 23)

The ALJ identified Plaintiff's past relevant work as a housekeeper, a machine packager, and a school bus driver.  Based on the VE's testimony, the ALJ concluded that Plaintiff could perform her past relevant work as a housekeeper, as well as other jobs that exist in significant numbers in the national economy, such as laundry worker and material handler.  Therefore, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act. (Tr. 27)

## VI.   Standard of Review and Legal Framework

To be eligible for disability benefits, a claimant must prove that she is disabled under the Act.  See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); see also Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A plaintiff will be found to have a disability "only if [his] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled…. The ALJ consider[s] whether:  (1) the claimant was employed; (2) [he] was severely impaired; (3) [his] impairment was, or was comparable to, a listed impairment; (4) [he] could perform past relevant work; and if not, (5) whether [he] could perform any other kind of work."  Martise v. Astrue, 641

16

F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)).

See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole.  See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).  Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.  Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The claimant's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the claimant's impairments.

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance.  Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## VII.   Analysis of Issues Presented

Plaintiff argues that the RFC is not supported by the weight of the evidence due to the ALJ's failure to include any limitations for chronic diarrhea, fecal incontinence, or fatigue, and that the ALJ erred in weighing the medical opinion evidence.  She argues that the ALJ's RFC failed to account for her need to use the bathroom, to take unscheduled breaks, and for time spent off task.

A claimant's RFC is the most an individual can do despite the combined effects of his credible limitations.  See 20 C.F.R. § 404.1545.  "'The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.'" Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996)).  An ALJ's RFC finding is based on all of the record evidence, the claimant's testimony regarding symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence.  See Wildman, 596 F.3d at 969; see also 20 C.F.R. § 404.1545; SSR

96-8p (listing factors to be considered when assessing a claimant's RFC, including medical source statements, recorded observations, and "effects of symptoms … that are reasonably attributed to a medically determinable impairment").  The ALJ must explain her assessment of the RFC with specific references to the record.  SSR 96-8 (the RFC assessment must cite "specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)" in describing how the evidence supports each conclusion).  Disability is not determined by the presence of impairments, but by the effect the impairments have on the individual's ability to perform substantial gainful activity.  20 C.F.R. §§ 404.1545(e), 416.945(e).

"It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  Pearsall, 274 F.3d at 1217; see also Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016).  Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by substantial medical evidence that the claimant could perform the requirements of competitive work without having his condition result in impermissible levels of off-task behavior such as lying down and absenteeism.  See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Here, the ALJ found that Plaintiff had the RFC to perform medium work, with additional enumerated limitations, which Plaintiff argues is not supported by substantial evidence.

The key to understanding the ALJ's decision is that she found that Plaintiff's diarrhea and fetal incontinence were stable and had largely resolved.  Thus, breaks and work absences due to chronic diarrhea or incontinence were not accounted for in the RFC.  The undersigned finds that substantial evidence in the record does not support such a conclusion.  A review of primary care provider Dr. Eugene's treatment notes demonstrates that Plaintiff's chronic diarrhea persisted up and until her last reported visit with Dr. Eugene in November 2020.

While it is no doubt true that Plaintiff had numerous doctors' visits in 2020 in which there

is no discussion of diarrhea or fecal incontinence, most of those visits focused on other medical concerns such as mental health issues or relatively routine physical issues.  But, the overall record shows that she continued to experience diarrhea, and a review of the relevant records supports the conclusion that the use of the terms "stable" and/or "largely resolved," cannot reasonably be read to mean that her chronic diarrhea had abated.

As recounted in greater detail above in the summary of Dr. Eugene's treatment notes, Dr. Eugene used the term "stable" or "resolved" to describe Plaintiff's diarrhea in the context of knowing that it was also a chronic problem.  For example, April 16, 2019, treatment notes reflect that Plaintiff reported she was doing well with erratic bowel function, but she still experienced bouts of diarrhea and daily fecal incontinence.  Similarly, June 6, 2019, treatment notes indicate that Plaintiff continued to have "chronic intermittent diarrhea, and … that everything has been stable."  (Tr. 1256)  In the same treatment notes, Dr. Eugene's review of symptoms noted that Plaintiff was negative for diarrhea.  August 19, 2019, treatment notes reflect that Plaintiff reported several days of severe diarrhea.   November 26, 2019, treatment notes reflect that Plaintiff complained that she was "very hindered by chronic diarrhea," yet Dr. Eugene's review of symptoms reported that she was negative for diarrhea.  (Tr. 1241)  On August 5, 2020, Plaintiff reported three days of diarrhea following a procedure.  And in the final treatment note contained in the record, dated November 27, 2020, Plaintiff reported that her diarrhea was "stable," but she also reported that her diarrhea was "a little bit worse since she has been feeling unwell."  (Tr. 1220)  More significantly, Dr. Eugene's notes for the visit reflect that Plaintiff continued to experience "chronic diarrhea due to radiation from squamous cell carcinoma."  (Tr. 1221)

Thus, although the medical records sometimes use terms like stable or resolved to describe Plaintiff's diarrhea or fecal incontinence issues, the records simultaneously regularly describe

Plaintiff's condition as chronic and in terms indicating that it was an ongoing and recurring issue up to and including the final medical visit reflected in the record. Thus, Plaintiff's diarrhea had not resolved such that it was no longer a medical concern or issue. Likewise, to the extent it was "stable," that term cannot reasonably be read to mean inconsequential. This is important because the RFC settled on by the ALJ's assumes no consequences or restrictions due to Plaintiff's ongoing and recurring diarrhea. The undersigned cannot say this is merely an issue limited to opinion writing; perhaps the ALJ did not recognize that Plaintiff's diarrhea remained a chronic concern up through at least November 2020, the entire relevant time frame. This issue not only impacts the review of the objective medical evidence, it also raises concerns regarding an assessment of Plaintiff's subjective complaints. The fact that the objective medical record reflects that she continued to experience chronic diarrhea up until November, 2020, would lend support to her subjective complaints. This concern also implicates assessment of the relevant opinion evidence. Therefore, the undersigned will not address Plaintiff's specific arguments regarding alleged deficiencies concerning the ALJ's consideration of the medical opinion evidence in the record.

Accordingly, the undersigned finds that remand is necessary to consider the impact of the reports of Plaintiff's continued chronic diarrhea in the medical records, including in November 2020, which was well after the time the ALJ's decision suggests that her condition was stable or resolved.

**VIII.   <u>Conclusion</u>**

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole. <u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001). "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion. <u>Id.</u>

Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Id.; see also Igo v. Colvin, 839 F.3d 724, 728 (8th Cir. 2016).  Here, however, the undersigned cannot say that substantial evidence supports a conclusion that Plaintiff's chronic diarrhea was resolved or stable. The RFC determined by the ALJ does not account for limitations due to chronic diarrhea.  The Court finds, therefore, that the Commissioner's determination is not supported by substantial evidence in the record as a whole.  The matter should be remanded so that Plaintiff's chronic diarrhea up through at least November 2020, can be considered in assessing Plaintiff's subjective complaints, the relevant medical expert opinions, and her RFC.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be REVERSED, and the cause is REMANDED to the Commissioner for further proceedings consistent with this Memorandum and Order.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 2nd day of March, 2023.

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE